Filed 10/25/21  P. v. Sampablo CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ARISTEO SAMPABLO, <br><br> Defendant and Appellant. | F080700 <br><br> (Super. Ct. No. VCF351623) <br><br><br> **OPINION** |

### THE COURT\*

APPEAL from a judgment of the Superior Court of Tulare County.  Juliet L. Boccone, Judge.

Kendall Dawson Wasley, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*        Before Levy, Acting P. J., Meehan, J. and Snauffer, J.

# INTRODUCTION

Defendant Aristeo Sampablo was convicted by jury of 41 counts of sexual offenses against two victims, E. and J. As to E., defendant was convicted of nine counts of sexual intercourse or sodomy of a child 10 years of age or younger under Penal Code section 288.7, subdivision (a) (counts 1–9);[1] and 19 counts of lewd and lascivious acts under section 288, subdivision (a) (section 288(a) or § 288(a)) (counts 10–28). Special allegations under the One Strike law (§ 667.61), asserting the multiple-victim circumstance on counts 10 through 28 were found true. (§ 667.61, subds. (b), (c), (e) & (j)(2).)

As to J., defendant was charged with one count of sexual penetration against a child under the age of 10 years pursuant to section 288.7, subdivision (b) (section 288.7(b) or § 288.7(b)) (count 29); and 12 counts of lewd and lascivious acts against a child under the age of 14 years under section 288(a) (counts 30–41). A multiple-victim allegation was made to all section 288(a) counts pursuant to the One Strike law, which were all found true. Defendant was sentenced to 41 consecutive terms of 25 years to life.

Defendant claims his trial counsel entirely failed to subject the prosecution's case to meaningful adversarial testing pursuant to *United States v. Cronic* (1984) 466 U.S. 648 (*Cronic*), which was presumptively prejudicial and requires reversal for violating his Sixth Amendment right to effective assistance of counsel under the federal Constitution. We disagree the circumstances here meet the standard under *Cronic*, no presumption of prejudice attaches, and defendant's Sixth Amendment claim fails. The 25-year-to-life term imposed on count 29 was unauthorized under section 288.7(b), and we modify the sentence on count 29 to impose a term of 15 years to life. The abstract of judgment must

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

be amended accordingly, and other clerical errors should be corrected. As modified, the judgment is otherwise affirmed.

## BACKGROUND

### I. Jury Selection

Jury selection was conducted on July 9, 2019. The court informed the venire the trial involved 41 counts of child molestation and there were two victims. The court then asked the entire panel whether there were any who felt they could not serve knowing the type of charges the case involved. The court indicated they might proceed in chambers with the lawyers present depending on the answers.

Forty-two prospective jurors expressed hardships and reasons why they felt they could not serve on the jury. Just over half of these prospective jurors made statements in open court they had experience with some type of sexual assault or abuse in their lives or families and felt they could not be impartial in a case of this nature. Three members of the venire stated their reasons outside of the courtroom in the presence of the trial judge and the attorneys. With the stipulation from counsel, all but two of these prospective jurors who initially felt they would be biased in this type of case were excused from serving. The court asked the remaining venire members about their responses to a questionnaire they had been asked to complete. After which, counsel approached the bench for a conference, and the court thanked and dismissed two prospective jurors.

A second panel was questioned. The prospective jurors were asked if there was anything about the nature of the case that would prevent them from serving. Of the jurors who voiced reasons why they could not serve, four more jurors stated the nature of the case was either too difficult for them to manage or they had prior experience with child molestation, which they felt rendered them unable to be impartial. Some of these jurors spoke with the court and attorneys privately in the jury room. Each of the prospective jurors who stated reasons why they could not serve was dismissed upon stipulation of the

3.

parties. Then the court conferenced with counsel off the record, and one more juror was thanked and excused.

The attorneys then questioned the remaining venire. Defense counsel questioned the prospective jurors about their ability to listen to the evidence with an open mind, and whether, given the nature of the charges, they could act impartially. As to those venire members who were mandated reporters in their professional lives, counsel asked whether they could still decide the case under the reasonable doubt standard that applies to criminal matters. Defense counsel also inquired whether any member of the venire would hold it against defendant if he decided not to testify.

The prosecution also asked questions about the venire's ability to fairly assess the evidence in this case. After this, an unreported conference was held at the bench and the court excused six more prospective jurors, including the two from the first panel questioned who told the court they might have problems being impartial given the nature of the case but were not dismissed. Another venire member then stated he might have problems serving because his jury service would be unpaid by his employer. Although the prosecutor agreed to this prospective juror's dismissal, defense counsel asked for a sidebar conference. After the conference, the court declined to dismiss the juror. Six more names were drawn from the pool, and they were asked to give responses to the questionnaire. Once that was completed, defense counsel stated he had no further questions for these new prospective jurors; the prosecutor asked additional questions. Another unrecorded conference was held at the bench, and the court excused three jurors. The remaining jurors were then sworn.

## II. Motion to Suppress and Opening Statement

The trial proceeded with preliminary instructions, after which the jury went home for the day. Before trial resumed the next day, defense counsel objected to the admission of defendant's police interview as violative of *Miranda v. Arizona* (1966) 384 U.S. 436. Counsel asserted the warning was incomplete and the purported waiver of rights was not

4.

knowingly given. The court overruled defendant's objection and deemed the interview statements admissible. The prosecutor gave an opening statement, but defendant's counsel did not and reserved the right to give an opening statement at the beginning of the defense case—which counsel subsequently elected not to do.

## III.   The Prosecution Case

The prosecutor called the victims' grandmother. She testified defendant had dated her daughter (mother) for three years, they had one daughter together, and they lived in an apartment together at the time the victims' allegations were reported to the police. Mother's children, including E. and J., would go to grandmother's house after school while mother worked. Defendant would then pick the kids up from grandmother's house when he was finished with work.

One day, grandmother asked E. why she appeared sad. E. started to cry and told grandmother she did not want to go home because defendant touches her. Grandmother called mother to tell her what E. had said. At some point later that night, mother picked up the kids and reported everything to the police. Defendant's counsel did not cross-examine grandmother.

Mother testified she has four children, including E. and J., three of which she had before she met defendant. She and E. and J. would spend time with defendant when he previously lived with his parents. Mother finished school after she started dating defendant, and she, defendant and the kids all moved into an apartment together.

Mother worked 12-hour shifts as a nurse, three to four days a week. Defendant would pick the girls up from grandmother's house after school. There were times mother would get home and E. and J. would be locked in their rooms. Mother received a call from grandmother on May 15, 2017. Grandmother said that E. had made some serious allegations about defendant and that mother should talk to E. Mother, who was with J. at the time of the call, asked J. whether she knew what was going on. J. started to cry, and mother packed up the kids and left the apartment. She never asked E. about what

happened, and she did not get specific details from J. either—mother testified she has never asked them the details because she does not want to know. Mother testified defendant had requested on several occasions that she engage in anal sex with him, but mother had refused. Defense counsel did not cross-examine mother.

E. took the stand next. She was born in 2007, and she was 12 years old at the time of trial. She testified she was eight or nine years old when her mom started dating defendant. E. testified to the multiple occasions that defendant had touched her "boobs," her "lower part" (i.e., vagina), and her "butt."[2] He also touched her butt with his penis. These things happened at the house where he lived before they all moved into the apartment together. Although she originally denied that he inserted his penis into her anus, she ultimately acknowledged he had done so more than three times. E. also testified she had touched his penis with her hand on more than three occasions. Defense counsel cross-examined E.

J. was born in 2008, and she was 10 years old at the time of trial. She testified that defendant started touching her when they all moved into the apartment. She described multiple occasions when he touched what she referred to as her "[b]oobs" and her "[b]utt," and that he would use his penis (which she referred to as his "private") and his hand to touch her "[b]utt." She admitted she did not tell the forensic interviewer everything; she kept "some stuff to herself." No cross-examination was conducted.

Detective German Barrios testified to lay a foundation for the forensic interviews of J. and E. that were conducted on May 23, 2017, and diagrams they had drawn on during the interviews. He reviewed the initial police report by another officer, and then Barrios contacted mother and arranged for the interviews. Those interviews were then played for the jury. E.'s forensic interview was somewhat different from her trial

---

[2]     E. referred to a diagram where she circled the areas where defendant touched her. She referred to defendant's penis as his "private."

testimony—in that interview she claimed defendant had put his penis inside her vagina two or three times at his old house and four times at the apartment; he put his penis in her anus about 18 times at the old house and not at all at the apartment; he had exposed his penis to her more than 20 times and tried to have E. touch it.

Finally, Barrios testified about his interview of defendant. The recording of a portion of that interview was played for the jury. Defendant admitted to pushing back the underwear of both E. and J. and that he had tried to put his semi-erect penis into their anuses, but it would not go inside. He admitted he did this to both girls about three times. He rubbed his penis on each girl about four times when they sat on his lap, and he touched both girls' vaginas with his fingers about three times. He admitted he made a "stupid mistake" and that he "fucked up big time."

## IV.    Defense Case

Defendant called witnesses to testify as to his character. Maria M. testified she had known defendant for 11 years and had dated him for about five years after high school. She has nieces and a nephew for whom she and defendant are godparents. She believes defendant had a good relationship with her nieces and nephew; her family loves defendant. She stated she knew the nature of the charges, but asserted defendant's character was not consistent with the charges. In her opinion, he would not do something like what is alleged.

Maria G. testified she met defendant when she was 9 or 10 years old; she views him as her uncle. After he started living with mother, she did not see him that often. She has never seen him do anything sexually inappropriate with her or anyone else. She has allowed him around her children, and she knows the charged offenses against him. She does not believe he did what he is accused of doing.

Defendant also testified in his own defense. He testified his statements during the police interview with Barrios were made out of fear, and what he told the officer was not true. He was afraid that something might happen to him if he did not tell the officer what

the officer wanted to hear. Defendant testified he was supposed to meet with mother at a park, but an officer showed up instead. He did not know the police were looking for him until they approached the window of the car he was driving. The officer who knocked on defendant's vehicle window drew a gun and pointed it at defendant. He got defendant out of his vehicle and sat him on the ground. He told defendant that he better tell the officer what he needed to know otherwise things were going to go badly for defendant. Another officer showed up, and they put defendant into a patrol car and took him to the station. During questioning, he was only thinking about surviving—that was why he said what he said about the girls. Defendant was cross-examined extensively about the course of the interview and the admissions he made to Barrios.

## V. Prosecution Rebuttal Case

In rebuttal, the prosecutor called Barrios back to the stand. Barrios testified he had parked three to four car lengths behind defendant's car at the park—he had not blocked defendant's ability to leave. He never put handcuffs on defendant, and he never drew his gun at any time during the contact. He never made any verbal or physical threats. After defendant made admissions during the interview, he was placed under arrest.

## VI. Jury Verdict and Sentencing

After final instructions were given to the jury, the parties both presented closing arguments. After deliberation, the jury found defendant guilty on all 41 counts and found all special allegations true, with the exception of one allegation on count 28.[3] Defendant filed a motion for a new trial based on trial counsel's ineffective assistance, which the

---

[3] On count 28, the jury's verdict form failed to indicate any finding with respect to one special allegation of multiple victims, which the prosecutor then dismissed. Nevertheless, the special allegations in the verdict form (and the information) essentially alleged the multiple-victim circumstance twice for each count, and one allegation under count 28 was found true. Defendant does not argue the dismissal of one of the multiple-victim circumstance allegations rendered the other multiple-victim circumstance allegation insufficient to sentence this count under the One Strike law or to the greater minimum life term under section 667.61, subdivision (j)(2).

8.

court denied. In the court's oral pronouncement of sentence, the court imposed an aggregate term of 1,025 years to life (25 years to life on all 41 counts, all consecutive).

## DISCUSSION

### I. No Entire Failure to Subject Prosecution's Case to Meaningful Adversarial Testing

Defendant claims his trial counsel's ineffective assistance was based on an actual breakdown in the adversary process at trial because his counsel failed to subject the prosecution's case to meaningful adversarial testing. Defendant maintains this type of ineffective assistance of counsel is prejudicial per se and reversal is required pursuant to *Cronic*.

In all criminal prosecutions, the accused has a federal constitutional right under the Sixth Amendment to the assistance of counsel. (U.S. Const., 6th Amend.) This right to counsel includes "'the right to the effective assistance of counsel.'" (*Strickland v. Washington* (1984) 466 U.S. 668, 686 (*Strickland*).) Under *Strickland*, a defendant who claims ineffective assistance of counsel must prove (1) "that counsel's representation fell below an objective standard of reasonableness" (*id.* at p. 688), and (2) that any such deficiency was "prejudicial to the defense" (*id.* at p. 692).

However, in "certain Sixth Amendment contexts, prejudice is presumed." (*Strickland, supra*, 466 U.S. at p. 692.) No showing of prejudice is required "if the accused is denied counsel at a critical stage of his trial" (*Cronic, supra*, 466 U.S. at p. 659, fn. omitted), or left "entirely without the assistance of counsel on appeal" (*Penson v. Ohio* (1988) 488 U.S. 75, 88). Prejudice is presumed "when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken" (*Roe v. Flores-Ortega* (2000) 528 U.S. 470, 484), even when the defendant has signed an appeal waiver (*Garza v. Idaho* (2019) ___ U.S. ___, ___ [139 S.Ct. 738, 744]). Finally, relevant here, prejudice is presumed "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing …." (*Cronic, supra*, at p. 659.)

"Prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost." (*Strickland, supra*, at p. 692.)

Defendant claims this case falls into the category of presumed prejudice articulated in *Cronic* where counsel has entirely failed to subject the prosecution's case to meaningful adversarial testing. However, cases come within this category only if """counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing."""" (*People v. Hernandez* (2012) 53 Cal.4th 1095, 1106, quoting *Bell v. Cone* (2002) 535 U.S. 685, 696.) The circumstances here do not meet that standard.

Defendant argues the failure of his trial counsel was continuous from the start to the end of the trial. According to defendant, his counsel performed only negligible action during voir dire, gave no opening statement, performed no cross-examination of four out of five government witnesses, performed no redirect of defendant, and gave a closing statement that was devoid of any advocacy.

Defendant's claim amounts only to second-guessing his trial counsel's defense strategy. Far from entirely failing to subject the prosecution's case to meaningful adversarial testing, defense counsel was present and participated at all critical stages of the proceedings. At jury voir dire, defense counsel posed questions to the venire—although he did not question every member of the venire. As the People point out, the trial court performed most of the voir dire questioning, and neither attorney asked a great deal of questions.

As for defense counsel's decision not to object to statements from members of the venire made in open court about their biases in this type of sexual abuse case, there were certainly strategic reasons that could explain this. While the court was willing to allow the venire to state their concerns or hardships privately in the jury room, most of the venire did not make such a request. Counsel may have wished to avoid embarrassing and potentially alienating members of the venire by insisting they state their concerns in private. Such a private conversation may also have been more intimidating to those

10.

prospective jurors.  In addition, counsel may have determined discussing the issue in open court would encourage other members of the venire to identify biases they might otherwise not have expressed.  In turn, this may have assisted the defense in obtaining a jury who did not harbor any hidden personal animus revolving around sexual molestation issues.

Defendant argues prejudicial statements made by the prospective jurors in open court infected the process from the beginning, to which defense counsel failed to object. Defendant cites *Mach v. Stewart* (9th Cir. 1998) 137 F.3d 630 (*Mach*) in support of this proposition.[4]

In *Mach*, a prospective juror in a sexual offense case stated that in her line of work, sexual assault was confirmed in every case in which one of her clients reported such an assault.  She testified that in three years in her position she had never become aware of a case where a child had lied about being sexually assaulted.  (*Mach, supra*, 137 F.3d at p. 632.)  Later, this prospective juror stated she had a background in psychology and worked extensively with psychologists and psychiatrists.  (*Ibid.*)  On appeal from a denial of a habeas petition, the appellate court concluded the prospective juror's expert-like statements, given their nature, the certainty with which they were delivered, the years of experience that led to them, and the number of times they were repeated, biased the defendant's jury.  (*Id.* at p. 633.)  Here, statements the prospective jurors made about being unable to serve given the nature of the case were all brief expressions of personal histories with sexual abuse or assault, which they felt made it too difficult for them to be impartial.  None of the statements were incendiary expressions of animus against alleged

---

[4]    Defendant makes no claim he was denied an impartial jury due to statements of the venire.  (See Cal. Const., art. I, § 16; U.S. Const., 6th & 14th Amends.; *People v. Clark* (2011) 52 Cal.4th 856, 895 [under both state and federal Constitutions, a criminal defendant is guaranteed the right to be tried by an impartial jury].)

11.

offenders of this type, or related expert-like information about sexual offenders generally as was the case in *Mach*.

Defendant's police interview was particularly damaging because he made prejudicial admissions to the interviewing officer. Defendant's trial counsel challenged the admissibility of those statements, and filed a nine-page motion to suppress, which was ultimately denied after argument.

Trial counsel elected not to give an opening statement, but that is often a matter of prudent trial strategy, particularly when the defense has not yet seen the government's evidence and it is not clear whether the defendant will elect to testify. There are sound strategy reasons that defense counsel may have been employing by reserving an opening statement. (See *People v. Mitcham* (1992) 1 Cal.4th 1027, 1059 [decision to reserve opening statement is a matter of tactics and strategy].)

Defense counsel interposed numerous objections during the prosecution's case and appeared to actively participate in the trial. Defense counsel did elect not to cross-examine several of the witnesses, including J. Three of the witnesses—mother, grandmother, and Barrios—gave very little substantive testimony. Mother had no knowledge of the abuse other than what the girls had told her, which she did not testify about in any detail. In fact, mother testified she did not know the extent of what happened to the girls because she did not want to know. Grandmother had no personal knowledge of the abuse, and her testimony was limited to how often the girls were with her and what led to E. confiding in her, which led Grandmother to notify mother. Barrios testified very briefly to lay a proper foundation for admitting E.'s and J.'s forensic interviews and defendant's interview. Defense counsel may have elected not to cross-examine these witnesses because he believed there was nothing beneficial to be gained by doing so.

Defendant cross-examined E., but elected not to cross-examine J. While the record does not disclose why counsel made that decision, there are tactical and strategic

12.

reasons that may support it. J. was only 10 years old at the time of trial, and trial counsel may have determined cross-examining her was unlikely to yield benefit for defendant because she was so young and/or because cross-examination of this young witness risked eliciting more jury sympathy in favor of the prosecution's case. Moreover, cross-examination risks eliciting further redirect examination that may do more damage. (See *People v. Cleveland* (2004) 32 Cal.4th 704, 746–747 [decision to what extent and how to cross-examine witnesses is within wide range of tactical decisions competent counsel must make].)

Defense counsel did not conduct any redirect of defendant after the prosecutor finished cross-examination. The problem, of course, was that defendant's testimony that he only made admissions during his police interview because of his fear of Barrios was implausible in light of the recorded interview that was played. Defense counsel may very well have concluded that any redirect examination would be even more damaging to defendant's credibility. The same is true of defense counsel's election not to cross-examine Barrios during the prosecutor's rebuttal case.

Finally, the closing argument was brief and not particularly pointed, but defense counsel urged the jury to keep the reasonable doubt standard in mind and to assess the evidence fairly and impartially. (See generally *People v. Carter* (2005) 36 Cal.4th 1114, 1190 ["Reasonably competent counsel could have determined that an extended summation would present the danger of focusing the jury's attention upon the heinous details of the crimes committed."].)

Considering the entire course of the proceedings, defendant's trial counsel participated in each stage of the proceedings and opposed the prosecution throughout: he questioned the venire, he cross-examined one of the prosecution's witnesses, he objected to testimony and challenged the admissibility of defendant's police interview, and presented a number of witnesses on defendant's behalf. Even if, at specific points, counsel was unable or failed to oppose the prosecution, prejudice is not presumed.

13.

(*People v. Hernandez, supra*, 53 Cal.4th at p. 1106.)  Under these circumstances, we cannot conclude defense counsel entirely failed to subject the prosecution's case to meaningful adversarial testing under *Cronic*.[5]  (See *People v. Carrasco* (2014) 59 Cal.4th 924, 990–991 [no complete lack of adversarial testing under *Cronic* where counsel gave opening statement and closing argument, cross-examined prosecution witnesses, objected to testimony and exhibits, and presented witnesses on the defendant's behalf].)

## II.     Unauthorized Sentence on Count 29

The only charge brought pursuant to section 288.7(b) was count 29. Section 288.7(b) provides that "[a]ny person 18 years of age or older who engages in oral copulation or sexual penetration, as defined in Section 289, with a child who is 10 years of age or younger is guilty of a felony and shall be punished by imprisonment in the state prison for a term of 15 years to life."

As with all the other counts, the jury found defendant guilty on count 29.  In the oral pronouncement of judgment, the court sentenced defendant to a term of 25 years to life.  This portion of the sentence is unauthorized.  Therefore, we modify the sentence on count 29 to reflect the term of 15 years to life as mandated under section 288.7(b). (§ 1260; *People v. Choi* (2021) 59 Cal.App.5th 753, 769 [unauthorized sentence may be corrected at any time by a court with jurisdiction].)

## III.     Amendment of the Abstract of Judgment

We have the inherent authority to correct clerical errors in an abstract of judgment and to order correction of abstracts of judgment that do not accurately reflect the oral judgment of the trial court.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)  On page 2 of the attachment to the abstract of judgment, the form incorrectly indicates count 29 was

---

[5]     Defendant has made no argument under *Strickland*, or argued how particular conduct of defense counsel was prejudicial.

14.

for an offense under section 288(a). Count 29 was charged under section 288.7(b), so that portion of the attachment is incorrect and should be amended.

Additionally, the check box at the bottom of the first page of the abstract of judgment is marked to indicate a 15-year-to-life term was imposed, and identifies count 28. Just below this check box, is a second box for 25-year-to-life terms. The box is checked, and the counts identified as imposing 25-year-to-life terms are "1–28 & 30–41." Yet, as noted, the court's oral pronouncement imposed terms of 25 years to life on all 41 counts—it did not impose a term of 15 years to life on count 29 as required under section 288.7(b). As we have modified the judgment on count 29 to impose a term of 15 years to life, the abstract of judgment should be amended to identify count 29 on which a term of 15 years to life was imposed.

## DISPOSITION

As modified, the judgment is affirmed. The trial court is directed to amend the abstract of judgment to reflect the judgment as modified, correct the clerical errors noted, and send a certified copy of the amended abstract of judgment to the appropriate authorities.